IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MICHELLE FERGUSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-2388-KHV |
| ) | |
| ASSOCIATED WHOLESALE GROCERS, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM AND ORDER

Plaintiff Michelle Ferguson brings suit against her employer, Associated Wholesale Grocers, Inc. ("AWG"). Plaintiff alleges sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.

This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #29) filed October 18, 2006. For reasons stated below, the Court sustains the motion in part.

### I. Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,

912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on her pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**II.   Facts**

The following facts are either uncontroverted or, where controverted, construed in the light most favorable to plaintiff:

In February of 2002, Elite Logistics ("Elite") hired plaintiff to work as a receiving clerk in the AWG warehouse in Kansas City, Kansas. On October 24, 2004, AWG took over operations at the warehouse, and hired substantially all of the Elite employees who had been working there. Plaintiff continues to work for AWG.

When plaintiff began working for Elite in February of 2002, she received a copy of Elite's anti-harassment policy.[1]  She read and understood the policy, which provided that Elite could

---

[1]   Plaintiff had previously worked for other employers who maintained anti-harassment and anti-retaliation policies. For example, plaintiff received anti-harassment training when she worked for the Unified Government of Wyandotte County, a position she held immediately before Elite hired her. The anti-harassment policy at the Unified Government provided that if an employee believed she was being harassed a complaint should be made to a supervisor or someone with whom the employee felt comfortable.

terminate without notice an employee who subjected other employees to "unsolicited and unwelcome sexual overtures or sexual conduct, either verbal or physical." On June 11, 2003, plaintiff received an updated anti-harassment policy from Elite. The updated policy stated that an employee had a responsibility to tell the harasser to stop and to report the harassment to his or her superior. If the harassment was by a superior, the employee was to complain to human resources. Further, if the employee was not satisfied with the initial handling of the report, the employee was to complain to Elite's human resources manager.

In April of 2004, shift supervisor Rhett Strader began to make inappropriate sexual comments to plaintiff. Strader's initial comments included statements about the way plaintiff was dressed, such as, "I like the way your shirt sticks out."[2] Ferguson Depo. at 73 to 74. Plaintiff asked Strader to stop making such comments but he laughed. Plaintiff also overheard Strader make similar comments to other women employees. Plaintiff believed that Strader sexually harassed her "to a certain extent" while she worked for Elite. Plaintiff kept contemporaneous notes concerning Strader's conduct, but she never complained about it to any supervisor or human resources employee.

On September 28, 2004, plaintiff approached Strader to discuss concerns about her supervisor, Cassandra Taylor. During that meeting Strader told plaintiff that he would help her, "but first [plaintiff] had to let him fuck [her]." When plaintiff asked Strader to "be serious" he replied that he was serious. Ferguson Depo. at 69 to 72. As the conversation continued, Strader pulled out money and asked plaintiff to go get a hotel room. Plaintiff did not report this conduct to anyone in a supervisory or human resources position at Elite.

On October 24, 2004, AWG took over all of Elite's operations and employees at the AWG warehouse. The next day, plaintiff received AWG's anti-harassment policy and employee handbook.[3] The handbook contained an equal employment opportunity policy which provided that AWG would not discriminate on the basis of sex, race, color, religion, age, national origin, disability

---

[2] Strader did not make these comments on a continuous basis.

[3] Plaintiff read it at some unspecified later time.

or veteran status. It also stated that if an employee had a question about a human resources issue or employment policy, the employee should contact the human resources department.[4] The "Harassment Complaint Procedure" provided that an employee who believed that she was the subject of harassment (or who had witnessed harassment) should "immediately" notify the employee's supervisor, the human resources director, the general counsel, the division manager or any officer of AWG. The handbook also stated that if an employee did not believe that the human resources department had adequately resolved an issue, the employee should take the complaint to the next level of management. AWG's anti-harassment policy also prohibited retaliation.

On the first or second day that plaintiff worked for AWG, all warehouse employees – including plaintiff – viewed a sexual harassment training video and received copies of the anti-harassment policy.[5] The video included information on what types of behavior might constitute sexual harassment and explained how to report harassment. That day, when Strader made a harassing remark to plaintiff, she reminded him about the video and he replied, "I don't pay attention to that bullshit." When plaintiff watched the training video she believed that Strader had sexually harassed her "to a certain extent" while the two had worked for Elite.[6]

---

[4] AWG's handbook also directed employees to notify the AWG hotline or the director of loss prevention if they believed criminal activity was occurring.

[5] In the argument section of its opening brief, referring to defendant's fact statement number 27, AWG states that all warehouse employees viewed the video on plaintiff's first or second day of work,. See Doc. # 30 at 21. Defendant's fact number 27, however, states that *plaintiff* – not *all warehouse employees* – viewed the video on the first or second day of plaintiff's employment at AWG. See Doc. #30 at 5, citing plaintiff's deposition at pages 46-47. In response to plaintiff's statement of fact number 62, however, AWG cites deposition testimony of Courtney Sweat Bell, a human resources manager for AWG, that on the first day that Elite employees became AWG employees, AWG told all warehouse employees about its anti-retaliation policy during an anti-harassment video training session.

[6] AWG runs three work shifts a day, and employs a shift manager for each shift. A shift manager has the authority to supervise and direct employees on the shift and to recommend discipline including termination for those employees. AWG hired Strader when it took over warehouse operations from Elite. Before it offered him the job as shift manager, AWG did not investigate Strader's background, character or work history. Plaintiff never complained of harassment while she and Strader were employed by Elite and AWG received no complaints about Strader before plaintiff complained on November 10, 2004.

4

On October 27, 2004 – a few days after plaintiff and Strader started to work for AWG – Strader stuck his hand down plaintiff's pants and touched her vagina. Shortly after this incident, plaintiff discussed the situation with a friend who was a detective with the Police Department in Kansas City, Kansas. At her friend's suggestion, plaintiff secretly tape-recorded two conversations with Strader on November 9, 2004. During the first conversation, Strader asked plaintiff if she would like to be his secretary. She said "no" because of what the job would entail. Strader stated that if plaintiff was his secretary she would have to "come at work and fuck and have fun." In the second conversation, Strader mentioned that he taught Sunday school. Plaintiff expressed surprise because Strader was "the biggest sinner around." He asked what she meant, and plaintiff referred to his groping her. Strader stated that he thought plaintiff liked it and that she "stuck out [her] behind for him to grab." She said that she did not enjoy it. Strader again stated that he thought she enjoyed it. Strader stated that he was a "womanizer."

The next day, on November 10, 2004, plaintiff wrote a letter to AWG complaining that Strader was sexually harassing her. Plaintiff gave the letter to Courtney Sweat, an AWG human resources manager.[7] The letter stated as follows:

> My name is Michelle Ferguson. I have worked in the AWG warehouse for the past three year[s]. During September and October 2004 I, along with other co-workers, began to have issues and problems with our immediate supervisor over workplace policies, her management practices and professionalism, etc. As a result, I went to the Warehouse Manager, Rhett Strader, to seek his input, advice and help. Since that time, I have been subjected to ongoing inappropriate sexual contact by Mr. Strader including not only verbal harassment by [sic] actual physical contact. I am attaching to this letter my notes documenting each instance that has occurred so far. Given his response to my past rejections I have no reason to believe it will stop. The last physical occurrence so upset me I was luckily able to take my scheduled vacation to avoid contact with him. I am now out of vacation days and have to return to the workplace. I fear for the loss of my job and to be in the same area with him. There is no shift Monday-Thursday, when I work, that he is not physically present.
>
> Please consider this letter formal notice to AWG of this conduct by a member of its management and, if you are not the proper person to receive such complaint, please forward it to the person who is.

---

[7] Sweat has since married and her last name is now Bell. Although plaintiff gave the letter to Sweat, she addressed the letter to "Larry Tucker/Julie Higgins, Human Resource Manager."

5

Defendant's Ex. H. Immediately after Sweat received plaintiff's letter, she and Jan Augustine, AWG associate general counsel, began to investigate the allegations. Sweat understood that she was to do a complete, thorough investigation and keep the investigation as confidential as possible. AWG placed plaintiff on paid leave during the investigation.[8] After plaintiff reported the alleged sexual harassment, Strader had no direct contact with her.

Sweat and Augustine interviewed plaintiff, Strader and several other AWG employees. They also reviewed the tape recordings which plaintiff had provided. Sweat and Augustine interviewed Strader after they interviewed plaintiff. Sweat testified that they told Strader that they were investigating an allegation of sexual harassment, that "it was taken very seriously, and that we needed him to be truthful and to let us know what had occurred, and that there was no retaliation, and . . . that most – that all this information should be kept confidential." Sweat Bell Depo. at 67. Sweat took notes of the interview but the notes did not reflect that Sweat or Augustine told Strader anything about retaliation or confidentiality.

Sweat also interviewed manager David Grisso, supervisors Buddy Alt, Cassandra Taylor, Tammy Northern and J. Green and warehouse clerks Paula Young, Albert Guerra, Debbie Green, Jamie Holland, Larry Tucker and Charlotte Norwood. Plaintiff faults AWG for not maintaining confidentiality.[9] In her deposition, Sweat stated that she had testified about everything discussed in her interviews with Grisso and Alt. Sweat did not testify that she warned Grisso and Alt not to retaliate against plaintiff or to keep the matter confidential. Sweat took notes of her interviews with Taylor, Northern, J. Green, Young, Guerra, Debbie Green, Holland, Tucker and Norwood. Sweat testified that the notes reflect everything that was discussed in the interviews. The notes, however, do not mention that Sweat warned the interviewees against retaliation or instructed them to keep the matter confidential.

---

[8] Between November 10 and 19, 2004, Strader worked all of his assigned shifts.

[9] Plaintiff also wanted AWG to better inform her about what it was doing during the investigation.

From the facts cited by the parties, it is not clear whether Sweat told any particular interviewee about plaintiff's allegations. Sweat testified that some of the interviewees were not aware of the allegations, and that she and Augustine therefore asked them only general questions about working relationships and the transition from Elite to AWG. They did this to minimize the number of employees who knew that plaintiff had complained of sexual harassment.

Sweat testified that after the investigation, she did not totally believe that Strader had sexually harassed plaintiff. She concluded, however, that Strader had engaged in inappropriate behavior. On November 19, 2004, AWG terminated Strader's employment.

When plaintiff returned to work after AWG terminated Strader's employment, she met with Sweat and Augustine. They told plaintiff that Strader was no longer with AWG, that the company would not tolerate retaliation and that plaintiff should report any retaliation. Sweat told plaintiff that if she wanted to temporarily move from the warehouse to a position in the office, Sweat would explore that possibility. Plaintiff declined the offer.

After plaintiff complained of harassment, the following incidents occurred: (1) on November 22, 2004, an unknown person slashed the tires on plaintiff's car outside her home; (2) between November 19 and November 28 plaintiff received threatening phone calls at home and at work, and the calls at work originated inside the warehouse; (3) on November 28 a co-worker received a threat directed at plaintiff on an inside phone line; (4) between November 22 and November 28 plaintiff's co-workers called her names such as "whore," "bitch," "slut" and "liar;" and (5) on November 28, someone in the warehouse break room threw two soda cans at plaintiff, and one can hit her in the back. Plaintiff has no idea who slashed her tires or whether anyone from AWG was responsible. After the incident, Sweat again offered to move plaintiff to a temporary position in the office until the warehouse "settled down." Plaintiff again refused.

On November 19, 2004, plaintiff received the first of several threatening phone calls. Plaintiff reported the first call (which she received at home) to an AWG supervisor who contacted Sweat. Sweat immediately called plaintiff at home and told her that the company could install a listening

device on her phone if she requested it. Sweat told plaintiff that she would get back to her about the security device, but she never did.[10] Plaintiff changed the access features on her home phone to block calls for which the caller had blocked the number.

After the initial threatening call, Sweat gave plaintiff her cell phone number in case plaintiff needed to reach her. Plaintiff understood that the company wanted to know if she thought that anything bad was happening to her so that the conduct could be stopped. Plaintiff received a second threatening call while she was in the warehouse at work. The caller called her names including "bitch," "cunt" and "whore." Plaintiff did not immediately report this call. About two hours later Sweat called plaintiff to check on her and to see how things were going. Plaintiff told her about the phone call. Sweat instructed plaintiff to contact her immediately after receiving any such calls. Sweat told plaintiff that if a call originated within AWG, it could be traced if acted upon quickly. Plaintiff never reported subsequent calls in a sufficiently timely manner to allow such tracing. A couple of days later, plaintiff received third call in which an unknown voice said, "You fucking bitch." Plaintiff did not report this call to Sweat.

On November 28, Cassandra Williams, a co-worker, received a call in which the caller said "tell the bitch to watch her back." Plaintiff cannot identify the male voices on the first three phone calls and she did not personally receive the fourth call. Because the second shift supervisors had close relationships with Strader, plaintiff believes that someone in management may have made the calls. Plaintiff admits that she is "guessing," however, and that she has no information that any AWG supervisor was involved in any threatening phone call. Similarly plaintiff has no information that anyone at AWG told AWG employees to make the calls.

Between November 22 and November 28, 2004, co-workers in the warehouse taunted plaintiff by calling her names such as "whore," "bitch," "slut" and "liar" behind her back. Plaintiff does not know the identities of these co-workers and she did not recognize their voices. Plaintiff

---

[10] Sweat recalls that plaintiff told her she wanted to think about the listening device and did not get back to her.

does not know if they were members of management or if anyone in management instructed workers to engage in the conduct. When plaintiff told Sweat about the name-calling, Sweat did not interview anyone. Sweat testified that she could not do a whole lot because defendant did not know who was doing the name-calling.[11]

On November 28, 2004, an unknown person threw two soda cans at plaintiff while she was in the AWG warehouse break room. One of the cans hit plaintiff in the back. She immediately went into the restroom and called Sweat on her cell phone. Sweat told plaintiff to wait in the ladies room until security arrived to accompany plaintiff to her car. Plaintiff has no idea who threw the can. After she reported the incident, Sweat looked at the security video to identify anyone who may have been in the area at the time. The video did not reveal any faces, however, and Sweat did nothing more to investigate. In response to the incident, however, AWG held a meeting on November 29 with some AWG employees to reiterate the policy regarding retaliation.[12] Plaintiff took a leave of absence after the incident on November 28.

On December 4, 2004, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission alleging harassment and retaliation.

On March 1, 2005, plaintiff returned to work in a clerical position in the AWG office.[13] Plaintiff returned to work in a comparable position with the same salary and benefits and her choice of shifts. When plaintiff returned to work, AWG again told her that it would not tolerate retaliation and that if she believed she was being retaliated against in any respect she should immediately contact Sweat, security or Dave Leiker, her supervisor.

---

[11] After the name-calling incidents, Sweat spoke with plaintiff and asked her how things were going. Plaintiff replied that "everything was okay" except for the name-calling.

[12] From the facts and record cited by the parties, it is not clear which employees attended the meeting on November 29.

[13] She does not allege that the job change was retaliatory.

**II.     Analysis**

Plaintiff claims that defendant subjected her to a sexually hostile work environment (Count I) and retaliated against her for complaining about the alleged harassment (Count II). Defendant asserts that it is entitled to summary judgment on plaintiff's harassment claim based on the affirmative defense outlined in Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Defendant asserts that it is entitled to summary judgment on the retaliation claim because (1) AWG did not condone or encourage the alleged retaliation and (2) plaintiff cannot establish a prima face case of retaliation because she has not suffered a challenged action which a reasonable person would find materially adverse as set out in Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006). Defendant also asserts that it is entitled to summary judgment on plaintiff's claim for punitive damages based on the good faith defense set out in Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999).

    **A.     Sexual Harassment Claim**

Title VII prohibits "discriminat[ion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986), the United States Supreme Court held that a plaintiff may establish a Title VII violation by proving that discrimination based on sex created a "hostile or abusive work environment." To constitute a hostile work environment, harassment must be sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. Id. at 67.

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. For purposes of summary judgment, defendant concedes that the alleged actions by Strader, an AWG supervisor, created a hostile work environment. By way of affirmative defense, defendant argues that it is shielded from liability under Faragher and Burlington Indus., Inc. v.

10

Ellerth, 524 U.S. 742 (1998).

Under Faragher and Ellerth, an employer may escape vicarious liability for the harassing acts of its supervisory employees if it proves a two-pronged affirmative defense. See Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. The defense applies only if the harassing supervisor took no tangible employment action against plaintiff. Harrison v. Eddy Potash, Inc., 248 F.3d 1014, 1024 (10th Cir. 2001) (citing Faragher, 524 U.S. at 807). If this condition is met, defendant can escape liability if it establishes by a preponderance of the evidence that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. To succeed on this defense, defendant must demonstrate that it is entitled to judgment as a matter of law on both prongs. See Ellerth, 524 U.S. at 765 (affirmative defense "comprises two necessary elements"); Harrison, 248 F.3d at 1024-26 (defendant must prove both prongs).

As for the first prong, defendant must show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. Defendant points out that it had an anti-harassment policy which provided that employees who believed that they were subjected to sexual harassment should immediately report the conduct. The policy contained multiple reporting avenues so that if an employee believed that she was being harassed by her own supervisor, she could report the alleged violations to someone other than that supervisor. Further, on the second day of employment with AWG, plaintiff and other warehouse employees viewed an anti-harassment training video. Once plaintiff reported the harassment, AWG placed plaintiff on paid leave so that she would have no further contact with Strader. It immediately investigated the allegations. Nine days after plaintiff reported the harassment, AWG fired Strader. Such evidence suggests that defendant exercised reasonable care to prevent and to correct the behavior, as required by the first prong of the Ellerth/Faragher affirmative defense. The Court need not determine whether defendant has established the first prong as a matter of law, however, because

11

it has failed to do so on the second prong.

Under the second prong, defendant must show that plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. AWG relies upon the fact that even though Strader began to make inappropriate sexual remarks to plaintiff in April of 2004 while they were both employed by Elite, she never reported Strader's actions under the Elite anti-harassment policy. AWG asserts that plaintiff unreasonably waited seven months – from April, when Strader began to harass her at Elite, until October, when she complained to AWG – to take advantage of corrective opportunities. Under the second prong of Faragher/Ellerth, courts have found that delays of less than seven months are unreasonable as a matter of law. See, e.g., Taylor v. CSX Transp, 418 F. Supp.2d 1284, 1309 (M.D. Ala. 2006) (six-month delay unreasonable); Conatzer v. Med. Prof'l Bldg. Servs., Inc., 255 F. Supp.2d 1259, 1270 (N.D. Okla. 2003) (17-day delay unreasonable); Desmarteau v. City of Wichita, Kansas, 64 F. Supp.2d 1067, 1080 (D. Kan. 1999) (five-month delay unreasonable); Dedner v. Oklahoma, 42 F. Supp.2d 1254, 1260 (E.D. Okla. 1999) (three-month delay unreasonable). AWG offers no authority, however, for the proposition that plaintiff's failure to take advantage of corrective measures under a prior employer carries over to it, as the new employer.

Plaintiff received anti-harassment training on October 25, 2004, her second day of work at AWG. Strader first harassed plaintiff at AWG on October 27, two days later, by putting his hand in her pants and touching her vagina. Plaintiff reported this and other incidents on November 10, only 14 days later. The Court cannot find as a matter of law that plaintiff unreasonably failed to take advantage of preventive or corrective opportunities or to otherwise avoid harm at AWG. Watts v. Kroger Co., 170 F.3d 505 (5th Cir. 1999) (genuine issue of material fact whether delay of over three months, during which harassment increased, was unreasonable); cf. Conatzer, 255 F. Supp.2d at 1270 (17-day delay before complaint constituted unreasonable delay as matter of law). The Court therefore finds that defendant is not entitled to summary judgment on plaintiff's sexual harassment claim based on the Faragher/Ellerth affirmative defense.

### B. Retaliation

To establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a causal connection links the protected activity and the adverse employment action. See Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1263 (10th Cir. 1998). Here, plaintiff alleges that the adverse employment action was co-worker harassment. Because harassment must be intentional on the part of the employer, an employer can only be liable for co-worker retaliation where supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it so as to condone and encourage the co-workers' actions. Gunnnell v. Utah Valley State Coll., 152 F.3d 1253, 1265 (10th Cir. 1998). Defendant asserts that it is entitled to summary judgment on the retaliation claim because AWG did not condone or encourage any co-worker retaliation and the alleged harassment was not materially adverse under Burlington.

Plaintiff alleges that co-workers and/ or supervisors retaliated against her for reporting sexual harassment in the following ways: (1) on November 22, 2004, an unknown person slashed her tires outside her home; (2) between November 19 and 28, plaintiff received threatening phone calls at home and work; (3) on November 28, a co-worker received a threat directed at plaintiff; (4) between November 22 and 28, unknown co-workers called plaintiff names such as "whore," "bitch," "slut" and "liar;" and (5) on November 28, an unknown co-worker hit her in the back with a soda can.

Defendant argues that plaintiff has produced no evidence that supervisory or management personnel orchestrated the harassment or knew about it and acquiesced in or condoned it.[14] Plaintiff asserts that this test does not apply where the identities of the persons who retaliated are unknown; that AWG knew about the retaliation and did little to protect her; and that instead of thoroughly

---

[14] The Court agrees, and because plaintiff has not produced evidence that supervisory or management personnel orchestrated the harassment or knew about and acquiesced in it, the Court need not reach AWG's alternative argument that a reasonable employee would not have found the co-worker harassment "materially adverse" under Burlington. In any event, this argument is facially untenable.

13

investigating, AWG managers "threw up their hands" because plaintiff could not identify the perpetrators.

Although the record shows that AWG knew of the retaliatory harassment by plaintiff's co-workers, plaintiff has not met her burden to produce evidence that AWG acquiesced in that retaliatory conduct.  AWG took the following steps to stop the retaliation:  (1) it offered to provide phone tracing at plaintiff's home and work (which plaintiff declined); (2) it told Strader that it would not tolerate retaliation; (3) Sweat gave plaintiff her cell phone number to report any retaliation; (4) Sweat viewed tapes of the break room to try to identify the employee(s) who threw soda cans at plaintiff; (5) Sweat offered to move plaintiff to an office position to protect her from retaliation in the warehouse (which plaintiff declined); (6) AWG held a meeting to inform certain employees that retaliation would not be tolerated; and (7) AWG granted plaintiff a leave of absence after the soda can incident.  A reasonable jury could not find that AWG orchestrated or condoned the retaliation by co-workers.  As a result, defendant is entitled to summary judgment on plaintiff's claim of retaliation by fellow employees.

### C.     Kolstad Defense

AWG asserts that it is entitled to summary judgment on the issue of punitive damages.  A Title VII plaintiff is entitled to punitive damages if her employer engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1).  "Malice" or "reckless indifference" do not require "a showing of egregious or outrageous" conduct, but instead require proof that the employer acted "in the face of a perceived risk that its actions [would] violate federal law."  Kolstad, 527 U.S. at 535-36 (1999).  An employer is vicariously liable for punitive damages where an employee serving in a "managerial capacity" committed the wrong while "acting in the scope of employment."  Kolstad, 527 U.S. at 543.  An employer may not be vicariously liable for punitive damages for the decisions of managerial agents, if those decisions are contrary to the employer's good faith efforts to comply with Title VII."  Id. at 545.  The Tenth Circuit has not yet decided whether the so-called Kolstad or "good faith defense"

14

is an affirmative defense on which the defendant bears the burden of proof or whether plaintiff must disprove defendant's good faith compliance with Title VII. McInnis v. Fairfield Cmtys. Inc., 458 F.3d 1129, 1137 n.3 (10th Cir. 2006) (citing Davey v. Lockheed Martin Corp., 301 F.3d 1204, 1209 (10th Cir. 2002)). A number of other courts, however, have determined that the defense is an affirmative one and place the burden on defendant. Id. (citing Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001); Romano v. U-Haul, Int'l, 233 F.3d 655, 670 (1st Cir. 2000); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999)). Based on these cases, this Court believes that the Tenth Circuit would also find that defendant has the burden to establish the defense.

To avail itself of Kolstad's good-faith-compliance standard, an employer must (1) adopt antidiscrimination policies; (2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and (3) make good faith efforts to enforce an antidiscrimination policy. Cadena v. Pacesetter Corp., 224 F.3d 1203, 1210 (10th Cir. 2000). As to the first prong, AWG has produced uncontroverted evidence that it maintained a written policy against discrimination and retaliation. On the second prong, AWG has produced uncontroverted evidence that when Elite warehouse employees began working for AWG, each employee received sexual harassment training and a copy of the antidiscrimination policies. AWG has met its burden to show as a matter of law that it made a good faith effort to educate its employees as required by Kolstad.

As for the third prong of Kolstad, AWG asserts that it made a good faith effort to enforce its antidiscrimination policy by immediately investigating plaintiff's complaint and terminating Strader, thus effectively ending the harassment. Plaintiff argues that when AWG interviewed employees during the investigation, it should have reminded each interviewee that AWG policy required confidentiality and prohibited retaliation. Plaintiff asserts that AWG's failure to do prevents it from showing as a matter of law that it made a good faith effort to enforce its antidiscrimination policy. This argument overlooks the fact that about one month before the investigation, AWG

15

provided all employees a copy of its antidiscrimination policy. Plaintiff does not assert that AWG antidiscrimination policy (or any state or federal statute) required it to remind interviewees about the no-retaliation and confidentiality provisions. AWG has shown as a matter of law that it made a good faith effort to enforce its antidiscrimination policy. AWG is entitled to summary judgment on plaintiff's claim for punitive damages under Kolstad.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #29) filed October 18, 2006 be and hereby is sustained as to plaintiff's claims of retaliation and for punitive damages. Plaintiff's sexual harassment claim for the period from October 24 to November 10, 2004 remains for trial**.**

Dated this 10th day of January, 2007 at Kansas City, Kansas.

s/Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge